**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**UNITED STATES OF AMERICA**

v.                                                                              Case No.: 8:09-CR-0078-T-33EAJ

**JAMES STANTON PERRY**
_____/

## REPORT AND RECOMMENDATION

Before the court are Defendant's **Motion to Suppress Evidence and Statements and Request for Evidentiary Hearing** (Dkt. 20) and the Government's **Response** (Dkt. 28). An evidentiary hearing and oral argument have been held. For the reasons stated herein, I recommend that the motion to suppress be denied.

## Findings of Fact

The following facts are established by a preponderance of credible evidence.

1. On December 9, 2008, Hillsborough County Sheriff's Office ("HCSO") Detective Angel Cruz ("Cruz") and other law enforcement officers were conducting surveillance of a tri-level residence at 19102 Sunlake Boulevard, Lutz, Florida ("the Sunlake residence") hoping to execute a warrant for Defendant's arrest.

2. At some point on that morning, Defendant and Stephen Tuttle ("Tuttle") exited the Sunlake residence, which was leased by Tuttle and his mother, Lory Bennett ("Bennett"). Tuttle entered the drivers side of a "U-Haul" truck parked in the driveway and Defendant entered the passenger side. Tuttle then began driving the truck toward Dale Mabry Highway.

3. Cruz and other law enforcement officers followed the vehicle and stopped it without incident at the intersection of Dale Mabry Highway and County Line Road, a ten-minute drive from the Sunlake residence. With their weapons drawn, the officers directed Defendant and Tuttle

to exit the vehicle.

4. After Defendant and Tuttle complied with these instructions, the officers placed Defendant under arrest, handcuffed him, and informed him of his Miranda rights. Tuttle was never placed under arrest or handcuffed.

5. Defendant was taken to a HCSO substation in Town & Country, Florida. Following Defendant's departure to the HCSO substation, Tuttle drove the U-Haul truck back to the Sunlake residence followed by Cruz.

6. At the HCSO substation, Defendant was interviewed by Detective Joseph Garcia ("Garcia"), who had been investigating Defendant for several burglaries. Garcia read Defendant his Miranda rights and, at 12:57 p.m., Garcia and another HCSO Detective witnessed Defendant sign a Miranda waiver form which fully stated Defendant's Miranda rights and affirmed he was not coerced into making a statement (Government's Ex. 4). Defendant subsequently admitted to his participation in several burglaries.[1]

7. Later in the interview, Garcia asked Defendant where he resided. Defendant informed Garcia that he lived at an apartment on Memorial Highway. Defendant in fact had a lease for the apartment, which he shared with his girlfriend. Defendant stated that he stored a couch at the Sunlake residence and occasionally "crashed" there, but he was adamant that he did not live there. Defendant further disclaimed any ownership of property located at the residence.

---

[1] One of these burglaries occurred at the residence of a DEA agent. Although the same DEA agent may have participated in the investigation of Defendant, there is no evidence that his actions tainted the investigation relating to the search of the Sunlake residence or the questioning of Defendant.

8. Back at the Sunlake residence, Cruz asked Tuttle about his relationship with Defendant. Tuttle told Cruz that Defendant paid him $500 the previous night to rent the basement of the residence ("the Basement") for one month and that Defendant was "staying there" and keeping property there.

9. Cruz advised Tuttle that he suspected there was stolen property within Defendant's room and that law enforcement wanted to search only that room. Tuttle responded that he had "nothing to do with anything that [Defendant] was doing" and verbally agreed to permit the search.

10. Tuttle then called Bennett and asked her to come to the residence. Cruz and Tuttle waited in front of the residence for her arrival.

11. At approximately 1:20 p.m., HCSO Detective Manrique Diaz ("Diaz") arrived at the Sunlake residence. Diaz saw Tuttle, Cruz, and Rick Garcia, a law enforcement supervisor, standing in front of the residence.[2]

12. Shortly thereafter, Diaz received a call from Garcia. Diaz asked if Defendant resided at the Sunlake residence. Garcia responded that, based on his interview of Defendant, Defendant was not residing at the Sunlake residence but was storing a couch there. Diaz communicated this information to the other law enforcement personnel on the scene.

13. Sometime after this call but before 2:20 p.m., Bennett arrived at the Sunlake residence. Diaz asked Bennett if Defendant was residing there and Bennett indicated he was not.

14. Cruz informed Bennett that he suspected there was stolen property in the residence and asked for consent to search it. Bennett responded that she had no problem with the search.

---

[2] As noted above, "Garcia" refers to Detective Joseph Garcia, not Rick Garcia.

15. At approximately 2:20 p.m., Tuttle and Bennett signed forms permitting law enforcement to search the Sunlake residence without a search warrant (Government's Exs. 1 and 2).

16. At approximately 3:00 p.m., Cruz, Diaz, and Rick Garcia entered the front door of the residence. The opened a closed, unlocked door inside the residence which concealed stairs leading to the Basement. Accompanied by Tuttle, they descended the stairs and entered the Basement, which consisted of two rooms and a closet.

17. The officers proceeded to search the entire Basement, including the closet.

18. Inside one of the rooms were several boxes; electronics including cameras, televisions, and video game systems; some jewelry; and a mattress with sheets on it that appeared to have been slept on. Tuttle acted surprised at the presence of these items. The closet contained items belonging to Bennett and her granddaughter.

19. On top of the mattress was a closed cosmetics bag, approximately twelve inches by six inches in size with a metal clip. Cruz lifted the bag, noted it was heavy, but could not discern the contents. Cruz opened the bag and inside discovered a loaded firearm and Defendant's drivers license.

20. On December 11, 2008, two days after Defendant's arrest, Cruz and Diaz interviewed Defendant for approximately forty-five minutes at the Orient Road Jail in Hillsborough County, Florida. Diaz advised Defendant that he retained his Miranda rights as read to him by Garcia on December 9, 2008. Defendant subsequently admitted to several burglaries and to ownership of the firearm found in the Basement. Defendant agreed to give a written statement documenting these admissions, however, Diaz did not have the proper forms to obtain a written statement at the time.

21. On December 17, 2008, Diaz and Cruz again visited Defendant at the Orient Road Jail. Although on this occasion Diaz had the proper forms to take a written statement, Defendant informed the detectives that he had obtained counsel and had nothing to say.

22. Diaz explained that he could not speak with Defendant without first contacting Defendant's counsel. Defendant responded that he "changed his mind" and insisted that he wanted to talk. Diaz explained the contents of a Miranda waiver form and at 12:55 p.m. Defendant signed it (Government's Ex. 3).

23. After signing the form, Defendant again made incriminating statements regarding his participation in burglaries and his ownership of the firearm found in the Basement. However, Defendant refused to provide a written statement.

24. The testimony offered at the hearing indicates that Defendant is an adult male without mental deficits.

## Conclusions of Law

### I. The Search of the Sunlake Residence

Defendant submits that law enforcement violated his Fourth Amendment rights when they searched the Basement without a warrant or his consent and that any evidence obtained from the search should consequently be suppressed. The Government responds that Defendant disclaimed any interest in the Basement or the property located therein and thus did not have an expectation of privacy in the Basement or the property that was protected by the Fourth Amendment.[3]

---

[3] Although the parties dispute whether Defendant has "standing" to challenge the search, the inquiry "is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." Minnesota v. Carter, 525 U.S. 83, 88 (1998) (citation and internal quotation marks omitted); United States v. Chaves, 169 F.3d 687, 690 (11th Cir. 1999) (suggesting Fourth Amendment inquiry was not properly labeled as a question of standing).

The Fourth Amendment establishes the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. const. amend. IV. A party challenging a search as unreasonable "must establish both a subjective and an objective expectation of privacy" in the target of the search. United States v. Segura-Baltazar, 448 F.3d 1281, 1286 (11th Cir. 2006). "The subjective component requires that a person exhibit an actual expectation of privacy, while the objective component requires that the privacy expectation be one that society is prepared to recognize as reasonable." Id. (citation and internal quotation marks omitted). A person claiming Fourth Amendment protections must demonstrate an expectation of privacy that "has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Minnesota v. Carter, 525 U.S. 83, 88 (1998) (citation and internal quotation marks omitted).

An otherwise valid expectation of privacy is subject to abandonment, "which can be inferred from words, acts and other objective facts." United States v. McKennon, 814 F.2d 1539, 1545-46 (11th Cir. 1987). Consequently, any subjective expectation of privacy in a residence may be undercut by statements indicating a lack of interest in the residence. See United States v. Sweeting, 933 F.2d 962, 964 (11th Cir. 1991). Similarly, "disclaiming ownership or knowledge of an item ends a legitimate expectation of privacy in that item." United States v. Hawkins, 681 F.2d 1343, 1345 (11th Cir. 1982).

In Sweeting, law enforcement seized several weapons during the search of a residence. 933 F.2d at 963. Aside from access, the defendants denied any relationship with the residence, claiming their mother rented the residence for their grandmother's benefit. Id. at 964. Although the defendants kept personal effects at the residence and had temporary access to it, these factors "[did]

6

not establish the requisite subjective expectation of privacy to assert standing when coupled with their explicit disclaimer of ownership or interest." Id. Indeed, the court reached this conclusion despite recognizing that the government had established that the defendants actually lived in the residence. Id. at 964 n.2.

Defendant's actions in the instant case are not unlike those of the defendants in Sweeting. During the December 9, 2009 interview with Garcia, Defendant was adamant that he did not live at the Sunlake residence. Defendant insisted that his only connection with the residence was that he occasionally "crashed" there and was storing a couch there. Moreover, by asserting that he owned no property at the Sunlake residence, Defendant effectively disclaimed any ownership or privacy interest in the items located there. Although Defendant in fact rented the Basement and stored his property there, his statements to Garcia undercut any subjective expectation of privacy he may have had in the Basement or the items stored therein, including the cosmetics bag. See Sweeting, 933 F.2d at 964; see e.g. United States v. Bell, 218 F. App'x 885, 895 (11th Cir. 2007) (per curiam) (unpublished) (reasoning defendant had no expectation of privacy in apartment because he insisted he was not the leaseholder and that his only connection to the apartment was a visit to help someone move furniture); United States v. Jones, 184 F. App'x 943, 945 (11th Cir. 2006) (per curiam) (unpublished) (finding defendant, who inconsistently claimed he lived at residence "from 'time to time'" and stored personal effects there, had no subjective expectation of privacy in residence because he also denied living there and told officers he did not have authority to consent to its search); United States v. Thompson, 171 F. App'x 823, 828 (11th Cir. 2006) (per curiam) (unpublished) (recognizing that defendant's disclaimer of ownership or interest in motel room deprived him of subjective expectation of privacy).

7

Because Defendant did not have a subjective expectation of privacy in the Basement at the time it was searched, Defendant's Fourth Amendment rights were not implicated by the search. See United States v. King, 509 F.3d 1338, 1341 (11th Cir. 2007) (per curiam); see also Rakas v. Illinois, 439 U.S. 128, 134 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed."). Further, Defendant may not vicariously challenge the search on behalf of Tuttle or Bennett. See Rakas, 439 U.S. at 133-34 ("Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted."); United States v. Rackley, 742 F.2d 1266, 1270 (11th Cir. 1984) ("A defendant's fourth amendment rights are violated only when the challenged conduct invades that party's legitimate expectation of privacy rather than the expectation of privacy of a third party."); accord United States v. Amaral-Estrada, 509 F.3d 820, 826 (7th Cir. 2007) ("A criminal defendant cannot assert a privacy interest on behalf of someone else."). Accordingly, the motion to suppress should be denied as to any evidence discovered during the search of the Basement, including those items found within the cosmetics bag.

## II. Defendant's Post-Arrest Statements

In addition to moving to suppress any evidence obtained from the Sunlake residence, Defendant also seeks to suppress any statements he made at the HCSO substation on the day of his arrest or during subsequent interviews at the Orient Road Jail on December 11 and 17, 2008. The Government responds that the statements are admissible because Defendant was properly read his Miranda rights beforehand and made the statements voluntarily, knowingly, and intelligently.

Before questioning a person who has been taken into police custody, law enforcement must

inform the person of 1) the right to remain silent, 2) the possibility that the person's statements could later be used as evidence, and 3) the right to the presence of retained or appointed counsel. Miranda v. Arizona, 384 U.S. 436, 444 (1966).

Nonetheless, a defendant "may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." Id. at 444. An express written waiver of Miranda rights "is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver." North Carolina v. Butler, 441 U.S. 369, 373 (1979). Rather, in assessing the validity of such a waiver, a court must undertake the following two-part inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

Moran v. Burbine, 475 U.S. 412, 421 (1986) (citations omitted); see also Arizona v. Fulminante, 499 U.S. 279, 286 & n.2 (1991) (identifying some of the factors a court may consider in analyzing the totality of the circumstances, including a defendant's age, education, and intelligence). The prosecution must establish the defendant's waiver of Miranda rights by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 168 (1986).

### a. December 9, 2008 Statements at HCSO Substation

Defendant was informed of his Miranda rights at the time of his arrest and again by Garcia at the HCSO substation. Indeed, at 12:57 p.m., Garcia and another HCSO Detective witnessed Defendant sign a Miranda waiver form listing his Miranda rights in full (Government's Ex. 4).

Moreover, the form affirms that Defendant was not threatened, coerced, or promised anything to induce him to make a statement. There is no evidence suggesting that Defendant's waiver was coerced or that Defendant failed to comprehend the nature of the waiver. The record shows that Defendant is a mature adult able to fully understand the nature of his Miranda rights. Because the totality of the circumstances indicates Defendant's waiver was voluntary, knowing, and intelligent, the motion to suppress should be denied as to any statements he made at the HCSO substation on December 9, 2008.

### b.     December 11, 2008 Statements at Orient Road Jail

On December 11, 2008, Cruz and Diaz visited Defendant at the Orient Road Jail. After Diaz verbally informed Defendant that he retained the Miranda rights Garcia read to him on December 9, 2008, Defendant admitted to his possession and ownership of the firearm found in the Basement. Moreover, Defendant agreed to provide a written statement at a later date. There is no evidence that Defendant was threatened or coerced into waiving his Miranda rights or that Defendant misunderstood the nature of his rights. As the totality of the circumstances reveals that Defendant's waiver of his Miranda rights was voluntary, knowing, and intelligent, the motion to suppress should be denied as to any statements he made at the Orient Road Jail on December 11, 2008.

### c.     December 17, 2008 Statements at Orient Road Jail

On December 17, 2008, Cruz and Diaz returned to the Orient Road Jail to again interview Defendant. Defendant initially informed the officers that he had retained counsel and would not speak with them. Diaz responded that he could not speak with Defendant without first contacting Defendant's counsel. However, rather than waiting for counsel, Defendant insisted that he wanted to speak with Cruz and Diaz outside the presence of counsel. At 12:55 p.m., Diaz witnessed

10

Defendant sign another Miranda waiver form fully listing Defendant's Miranda rights and affirming that he was not coerced or threatened into waiving his rights (Government's Ex. 3).

As with the December 11, 2008 interview, there is no evidence that Defendant was threatened or coerced into waiving his Miranda rights and the totality of the circumstances reveals that Defendant's waiver of his Miranda rights was voluntary, knowing, and intelligent. Nonetheless, the circumstances of the December 17, 2008 interview were different insofar as Defendant, before signing the Miranda waiver form, informed the officers that he had secured counsel.

Once a defendant invokes the right to counsel, further interrogation must cease "unless the accused himself initiates further communication, exchanges, or conversations with the police." Edwards v. Arizona, 451 U.S. 477, 484-85 (1981). Interrogation includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Gomez, 927 F.2d 1530, 1538 (11th Cir. 1991) (citation and internal quotation marks omitted).

"The Edwards rule is designed to prevent police from badgering a defendant into waiving his previously asserted Miranda rights." Montejo v. Louisiana, ___ S. Ct. ___, 2009 WL 1443049, at *6 (May 26, 2009) (citation and internal quotation marks omitted).[4] The Edwards rule is thus not

---

[4] In Montejo, the Court overruled Michigan v. Jackson, 475 U.S. 625 (1986), which forbade the police from initiating an interrogation of a criminal defendant subsequent to the defendant's request for counsel at an arraignment or similar proceeding. Montejo, 2009 WL 1443049, at *2. The Court reasoned that the right to the presence of counsel during custodial interrogation is sufficiently protected by the "three layers of prophylaxis" provided in Miranda, Edwards, and Minnick v. Mississippi, 498 U.S. 146 (1990). Montejo, 209 WL 1443049, at *11. After weighing the "marginal benefits" of Jackson against its "substantial costs to the truth-seeking process and the criminal justice system," the Court concluded that Jackson did not "pay its way." Id. at *13 (citation and internal quotation marks omitted).

11

implicated where a defendant waives his rights absent badgering from law enforcement. See id. at *8 (emphasizing that Edwards is meant to prevent police from badgering defendants into changing their minds about their rights, not "to prevent a defendant altogether from waiving his Sixth Amendment rights"). In the absence of such badgering, a defendant may freely waive the right to counsel "whether or not he is already represented by counsel; the decision to waive need not itself be counseled." Id. at *6 (citing Michigan v. Harvey, 494 U.S. 344, 352-53 (1990) ("nothing in the Sixth Amendment prevents a suspect charged with a crime and represented by counsel from voluntarily choosing, on his own, to speak with police in the absence of an attorney.")).

Upon learning that Defendant was represented by counsel, Cruz and Diaz complied with their duty to cease any further interrogation of Defendant. Diaz's statement that he could not speak with Defendant outside the presence of counsel was not an attempt to initiate any further conversation or dialogue. See Oregon v. Bradshaw, 462 U.S. 1039, 1045 (1983) (plurality opinion); cf. United States v. Johnson, 812 F.2d 1329, 1331 (11th Cir. 1986) (holding FBI agent improperly responded to defendant's invocation of the right to counsel by asking "Do you want to know what will happen to you?" and continuing the conversation). Nor was Diaz's statement "reasonably likely to [elicit] an incriminating response." Gomez, 927 F.2d at 1538 (finding statements regarding the benefits of cooperation and possible sentencing, made to defendant after he invoked the right to counsel, were improper). Defendant's request to continue the conversation was an unprompted initiation of further conversation that allowed the officers to resume their interrogation.

The fact that Defendant's request came immediately after his refusal to speak has little import because the record is clear that Cruz and Diaz did not question Defendant until after he changed his mind. Although the period of time between the termination of an interrogation and a

12

subsequent defendant-initiated confession is one measure of the voluntariness of the confession, the admissibility of the confession ultimately turns on whether it was "the product of improper police questioning or pressure." Henderson v. Singletary, 968 F.2d 1070, 1074 (11th Cir. 1992). Defendant's assertion that he had obtained counsel and would not talk to Cruz and Diaz preceded any questions from the officers. Moreover, there were no questions until after Defendant reinitiated the conversation. Despite the brief lapse of time between Defendant's initial decision not to talk and his subsequent change of heart, which included signing a Miranda waiver form, his confession was not the product of improper police questioning or pressure.[5]

Indeed, in light of his prior statements during the December 11, 2008 interview, Defendant "may have felt that he had little to lose in confessing, given that the police already had one complete statement from him." Henderson, 968 F.2d at 1075. Because Defendant "simply changed his mind," the fact that his statements followed an initial invocation of his Miranda rights does not render those statements inadmissible. Id.; see also Moore v. Dugger, 856 F.2d 129, 131-33 (11th Cir. 1988) (finding defendant initiated subsequent conversation where detective asked question regarding crime, defendant requested an attorney, detective ceased questioning and told defendant he would return with an attorney, and defendant immediately responded that he would "finish his story"). Moreover, Defendant was re-Mirandized and waived his rights before the officers questioned him.

---

[5] In Gomez, the court held the defendant's statements should have been suppressed in part because his re-initiation of a conversation with police "occurred almost immediately after the interrogation, not several hours later." 927 F.2d at 1537. However, the court also emphasized that the police improperly "continued to talk to [the defendant] after he requested counsel, stressing the importance of cooperating." Id. Here, neither Cruz nor Diaz made any improper statements to Defendant once he informed them that he had retained counsel and declined to make a statement.

13

Defendant voluntarily initiated the subsequent conversation with Cruz and Diaz without prompting from the officers and signed the Miranda waiver form voluntarily, knowingly, and intelligently. Accordingly, the motion to suppress should be denied as to Defendant's statements during the December 17, 2008 interview.

## Conclusion

Regardless of whether Defendant rented the basement of the Sunlake residence, stored his belongings there, and occasionally slept there, Defendant's statements to Garcia extinguished any subjective expectation of privacy he had in the Basement or the items located therein. As a result, Defendant may not raise a Fourth Amendment challenge to the search of the Basement on his own behalf or on behalf of Tuttle or Bennett. Accordingly, Defendant's motion to suppress should be denied as to any evidence seized during that search, including the evidence discovered in the cosmetics bag.

Because Defendant validly waived his Miranda rights during his interview with Garcia on December 9, 2008, his statements during that interview should not be suppressed. Defendant's statements during the December 11, 2008 interview with Cruz and Diaz were similarly made voluntarily, knowingly, and intelligently, and should not be suppressed. Finally, Defendant's motion should be denied as to his statements during the December 17, 2008 interview with Cruz and Diaz, despite Defendant's initial invocation of his Miranda rights, because Defendant initiated further conversation without questions or pressure from the officers and validly waived his Miranda rights.

Accordingly and upon consideration, it is **RECOMMENDED** that:

(1) Defendant's Motion to Suppress Evidence and Statements and Request for Evidentiary Hearing (Dkt. 20) be **DENIED.**

**Date: June 5, 2009**

*/s/ Elizabeth A. Jenkins*
ELIZABETH A. JENKINS
United States Magistrate Judge

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of this service shall bar an aggrieved party from attacking the factual findings on appeal. See 28 U.S.C. § 636(b)(1).

**Any party objecting to the report and recommendation shall file a copy of the transcript.**

Copies to:
Counsel of Record
District Judge